CARGILL, INCORPORATED,
Appellant,

v.

Frank WESTON, Individually and
d/b/a Weston Elevator Company,
a sole proprietorship, Appellee.

No. 74–1995.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1975.

Decided July 17, 1975.

F. P. Cribbs, Jr., Memphis, Tenn., for appellant.

John Burris, Pocahontas, Ark., for appellee.

Before GIBSON, Chief Judge, STEPHENSON, Circuit Judge, and SMITH, Senior District Judge.*

GIBSON, Chief Judge.

Plaintiff, Cargill, Inc., appeals the trial court's grant of judgment in favor of defendant, Frank Weston, on its claim for damages for breach of a contract to deliver soybeans. Weston, an Arkansas farmer who owns 156 acres and rents about 800 acres for his farming operation, began in 1972 to buy, sell and store grain in bins on his farm under the name of Weston Elevator Company. The parties contracted September 5, 1972, for the delivery of 20,000 bushels of # 1 yellow soybeans to be delivered in October and November, 1972, at a contract price of $3.35 per bushel. The contract was accepted "Weston Elevator by Frank Weston."

Due to unprecedented weather conditions in the South-Central United States

* The Honorable Talbot Smith, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.

during the fall and winter of 1972, Weston was unable to harvest a substantial portion of the soybeans he had planted on his own land. However, during October and November, 1972, he did deliver over 20,000 bushels of soybeans to another grain firm on contracts entered into after the Cargill contract. Those beans were obtained from other producers and were not raised by him. On November 30, 1972, the last date for performance under the original contract, Weston had not delivered 18,463 bushels. The market price at that time was $3.69 a bushel, which would have established damages in the amount of $6,277.42.

Many of the sellers under contract with Cargill were experiencing similar difficulties fulfilling their contracts during this same period of time. It is undisputed that during this same period the price of soybeans was beginning its rise to record heights. Instead of cancelling all these contracts when the time for performance passed and covering in the market, Cargill mailed extension agreements to the sellers in which it agreed to extend the delivery dates for an additional 30 days. Weston never executed any of these extension agreements mailed by Cargill.

The first personal contact between Weston and Cargill was sometime in January, 1973. At that time it was Cargill's understanding that Weston wished additional time to perform, though Weston denies ever requesting any extension. His position was, however, that all beans harvested by him from his own and rented lands would be delivered to Cargill at the contract price. A personal visit was made to Weston January 31, 1973, by Allen Housh, Memphis Manager for Cargill, as evidenced by his letter of February 1, 1973, to Weston.[1]

Deliveries of soybeans were made by Weston in December, January, March and April, for which he was paid the contract price. There remained 10,585 bushels of soybeans undelivered on the contract on May 31, 1973, the date Cargill cancelled the contract pursuant to its receipt of a letter from Weston.[2] The market price at that time was $10.48 per bushel and Cargill sought damages of $75,471.05 for Weston's breach.

The case was tried to a jury and submitted on special interrogatories.[3] Ac-

1. That letter read in pertinent part:

> Thank you for visiting with me during my visit in Corning yesterday. This letter will confirm our agreement regarding the open balance on our soybean contract PR 49995, dated September 5, 1972.
>
> \* \* \* \* \* \*
>
> 2. Weston Elevator Company will deliver the balance of the beans that remain open during February or March as weather permits.

2. Weston's May 29, 1973, letter to Cargill read:

> Reference is made to your letter dated May 17, 1973 which I received on May 21, 1973 by certified mail.
>
> On contract # PR 49995, you have seemed to over looked or forgotten to fulfill your obligations to cancel out contract # PR 49995, which Mr. Allen Housh and I discussed over the phone April 12, 1973, that I would deliver approximately 3200 bu. Soybeans at the time after these were delivered there would be no more Soybeans available, do to heavy losses and bad flooding in this area, to cancel out balance of contract # PR 49995 at market price, which should be on April 19, 1973.

3. Those interrogatories and the jury's answers were as follows:

1. It is undisputed that Cargill attempted several times to obtain an agreement from Mr. Weston to extend the delivery date under the original September 5, 1972 contract. Did Mr. Weston ever, at any time from December 1, 1972 until May 31, 1973, agree to any such extension?

ANSWER: Yes.

If your answer is "No" do not answer the remaining parts.

(a) What was the date or approximate date of such extension agreement?

ANSWER: January, 1973.

(b) What was the latest extended date for delivery agreed upon?

ANSWER: April 19, 1973.

2. As of November 30, 1973—the last date for performance under the September 5, 1972 agreement—did the representatives of Cargill who dealt with Mr. Weston have a definite opinion and expectation that the market price of soybeans in the following months would significantly rise; would remain the same; would fall, or did they have no opinion on this matter?

ANSWER: Would rise significantly.

3. (a) It is undisputed that Mr. Weston delivered only 1,537 bushels of Soybeans to Cargill prior to the end of November 1972. However, it is also undisputed that subse-

cording to the jury's answers Cargill was entitled to judgment based upon the market price April 19, 1973. However, the trial court instead of promptly approving the form of judgment as contemplated by Fed.R.Civ.P. 58, entered judgment for Weston, apparently based on its belief that there was insufficient evidence to support the jury's finding that there was an extension agreement between the parties.[4] Cargill appeals.

■ The parties have stated the question on appeal as being whether judgment notwithstanding the verdict was properly granted. While the trial court's

> quent to December 1, 1972 he delivered at various dates an additional 7,878 bushels of soybeans to Cargill, for which he was paid by Cargill the price of $3.35 per bushel, although the actual market price of soybeans at the dates of the actual deliveries varied from $4.03 and three-quarters to $6.73 and one-quarter per bushel.
>
> What was the understanding and agreement of the parties, if any, concerning the delivery and receipt of the soybeans after December 1, 1972? Did the parties agree to settle Cargill's claim against Mr. Weston if Mr. Weston would make every effort to salvage the beans in his crop and deliver all such beans to Cargill at the original contract price on the additional understanding that Cargill would have no further claims against Mr. Weston?
>
> ANSWER: No.
>
> 4. Did Mr. Weston, when he made the original agreement with Cargill in September 1972, contemplate that he would perform the contract by delivering to Cargill soybeans which he had grown on his own land and upon land rented from others?
>
> ANSWER: No.

4. The District Court, prior to entering the verdict for Weston, stated for the record:

> It is undisputed and there is absolutely no basis or factor in law for the existence of any extension agreement prior to the defaulting under the original agreement.

It then made the following determinations:

> First, I do not believe there is an adequate basis for the finding of an extension agreement, even though the jury has found one. I do not believe, additionally, that even though there may have been an agreement as they contemplate that—that is, a meeting of the minds—that there was any consideration which would have supported it.
>
> *   *   *   *   *   *
>
> I think the law requires them and required them to cover their loss without some agree-

action had the same effect as a judgment n. o. v., it is clear that judgment n. o. v. was not granted nor could it have been granted on the present record. The requisites for the grant of judgment n. o. v. pursuant to Fed.R.Civ.P. 50(b)[5] are absent here. First, there was no motion for judgment notwithstanding the verdict on behalf of Weston. Second, there was no motion for directed verdict at the close of all the evidence. Both are requisites for the court's action in setting aside a jury verdict upon grounds of the insufficiency of the evidence. *Tsai v. Rosenthal,* 297 F.2d 614, 618 (8th Cir. 1961); 5A *Moore's Federal Practice* ¶ 50.-

> ment extending the date for performance prior to its expiration. * * *
>
> In other words, in contemplation of the law they should have covered. They would have been out between 6 and $7,000.00. They have subsequently received beans where the difference in the value of those beans between the contract price of $3.35 and what the market prices were on the various dates of delivery exceeded the 6 to $7,000.00.
>
> If a counterclaim had been filed I believe that Mr. Weston would be entitled to recover. He has not filed it and the Court is not going to award any judgment against Cargill. But it is going to find that he has fully paid the damages suffered by Cargill. * *
>
> I must say also that I have a bad feeling about the case, one that I did not start with at all but one which grew as the testimony went on; the feeling being that a company of great stature and power and great knowledge and awareness in this whole field was using its knowledge and power in a way that I cannot view as any other than unconscionable. I think if there was a so-called extension agreement it certainly was unconscionable under the circumstances.

5. Fed.R.Civ.P. 50(b) provides in part:

> *Motion for Judgment Notwithstanding the Verdict.*
>
> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for directed verdict.

08 (2d ed. 1974) [hereinafter cited as *Moore*].

■ It is therefore clear that the judgment entered on behalf of Weston cannot stand. *See Compton v. United States,* 377 F.2d 408, 412 (8th Cir. 1967). While the unusual procedural posture of this case presents some conceptual difficulty in determining the proper disposition of this appeal, we believe it is appropriate to treat this case as involving an erroneous grant of judgment notwithstanding the verdict. In such a case there are three generally recognized options for disposition of the appeal. The jury verdict may be ordered reinstated. *Compton v. United States, supra* at 412; *Hansen v. Firestone Tire & Rubber Co.,* 276 F.2d 254, 255 (6th Cir. 1960); 5A *Moore* ¶ 50.14 at 2383; 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2540 at 614 (1971) [hereinafter cited as *Wright & Miller*]. The case could be remanded for the trial court's consideration in light of our disposition of the judgment entered for Weston, *Iacurci v. Lummus Co.,* 387 U.S. 86, 88, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967); 5A *Moore* ¶ 50.14 at 2383–84; 9 *Wright & Miller* § 2540 at 615, or a new trial can be ordered. *Neely v. Martin K. Eby Construction Co.,* 386 U.S. 317, 328, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); *Derr v. Safeway Stores, Inc.,* 404 F.2d 634, 639 (10th Cir. 1968); 5A *Moore* ¶ 50.14 at 2383; 9 *Wright & Miller* § 2540 at 615.

■ We believe the proper disposition is to order a new trial of this action. The trial court clearly indicated its belief that the jury's verdict was erroneous and that Cargill's actions in attempting to extend the contract were unconscionable. Pursuant to Fed.R.Civ.P. 59(d), it could have *sua sponte* ordered a new trial

within 10 days of entry of judgment without motion of the parties. Moreover, a new trial is appropriate in this case since it has proceeded since inception, through trial and appeal, with the failure by the parties to recognize that the dispute is governed by provisions of the Uniform Commercial Code.[6] Proper resolution of this case turns upon difficult questions arising under the Code, including but not limited to the question of whether Weston is a "merchant", *see* Ark.Stat.Ann. § 85–2–104; *Cook Grains, Inc. v. Fallis,* 239 Ark. 962, 395 S.W.2d 555 (1965), or whether the statute of frauds was satisfied by the alleged extension agreement, *see* Ark.Stat.Ann. § 85–2–201. These questions were unrecognized or ignored by the parties throughout this lawsuit.

Furthermore, this court has been hampered by the appellant's failure to prepare an appendix in compliance with Fed.R.App.P. 30(a).[7] At one time we would have found it inconceivable that parties would expect appellate review of a contract case involving difficult questions of law arising under the Uniform Commercial Code without an attempt to brief those questions and without so much as including a copy of the contract in the appendix. Proper concern for their clients' interests should have led counsel in this case to adequately address the issues involved and a proper respect for the rules of procedure evolved for the orderly and speedy disposition of litigation would dictate that they be followed. We trust that the inadequacies identified in this opinion will not arise upon retrial of this case.

The judgment is reversed and the cause remanded to the District Court with directions to grant a new trial.

---

6. Ark.Stat.Ann. §§ 85–1–101 through 85–9–507 (1961 Add.).

7. Notice was given the parties before oral argument in this case that the appendices filed herein failed to comply with Fed.R.App.P. 30. The serious and substantial defects remain unremedied. Those defects include the failure of the appendices to contain: (1) the relevant docket entries; (2) the relevant portions of the pleadings, court's charge to the jury, or the interrogatories and jury's answers thereto; (3) the judgment in question; and (4) other relevant portions of the record, *i. e.,* the contract in question.