**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-40660

JAMES HAROLD CURRY,

Plaintiff-Appellee,

VERSUS

ENSCO OFFSHORE COMPANY,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

(3:00-CV-22)

October 30, 2002

Before GARWOOD and DENNIS, Circuit Judges, and LITTLE, District
Judge.[*]

DENNIS, Circuit[*]

    In this diversity action, James Harold Curry ("Curry") sues

---

    [*] Chief District Judge of the Western District of Louisiana,
sitting by designation.

    [*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

his former employer, ENSCO Offshore Company ("ENSCO"), for injuries he suffered while working on an offshore drilling rig. Curry states claims for negligence under the Jones Act, 46 U.S.C. § 688, and for unseaworthiness of the vessel under maritime tort law. At the end of a five-day trial, the jury returned a verdict in favor of Curry on his negligence claim but in favor of ENSCO rejecting his unseaworthiness claim. The jury awarded Curry $507,562 in damages on his negligence claim for loss of past earnings, loss of future earning capacity, future medical expenses, and pain and suffering. On that claim, the jury apportioned fault for Curry's injury sixty percent to ENSCO and forty percent to Curry.

Shortly before the jury returned its verdict, the district court denied ENSCO's pre-verdict motions for judgment as a matter of law to dismiss Curry's claims and request for future medical expenses. Immediately after taking the verdict, the court, acting *sua sponte*, asked the parties to brief the issue of Curry's contributory negligence. Without specifically addressing the issue again, the court ordered that final judgment be entered for Curry in the amount of $507,562, plus pre-judgment and post-judgment interest, thus implicitly granting judgment as a matter of law for Curry exculpating him of any contributory negligence. After the court denied ENSCO's post-verdict motions, including its renewed motion for judgment as a matter of law, ENSCO timely appealed.

2

## I. FACTS AND PROCEDURAL HISTORY

James Curry worked as a derrickman on ENSCO's drilling rig 94. On July 6, 1997, ENSCO made the decision to dismantle the rig's top drive in place, in preparation for the rig's move to a new location. Among other tasks, Curry was assigned to help with its dismantling. The top drive is a fifty-foot long piece of machinery that is used to turn the rig's drill stem. It operates in a position vertical to the drill floor. Because ENSCO did not erect a platform for the dismantling job, Curry had to be hoisted into the air in a riding belt to perform the work. While suspended, Curry used a ten- to sixteen-pound sledgehammer to jolt lose pipe fittings. He spent six or seven hours in the riding belt during his twelve-hour shift that day.

Curry began to experience pain in his lower back sometime during his work shift on July 6, 1997. Chad Jones, Curry's coworker, testified that Curry complained of pain after he had been in the riding belt and that he could see the pain on Curry's face after he finished his work in the belt. Curry was in severe pain the next day. He reported for duty but did not perform much work. He sought treatment from the rig's medic, who asked him whether he had been in a riding belt.[1] On July 9, 1997, Curry sought treatment from medical personnel on shore. He was diagnosed with

_____

[1] Curry completed an Employee Injury or Illness Report, on which he wrote, "I felt fine when I got off work. Got up and my leg was hurting and got worse as the day went on." He stated on the report that the time of his injury was "unknown."

lumbar disc herniations and underwent a lumbar laminectomy and discectomy. After being released by his doctors and limited by a functional capacity evaluation to medium-level work, Curry went to work as a welder, the job he held at the time of trial. Curry maintains that he continues to experience back pain, for which he takes prescription and nonprescription pain medication.

On January 14, 2000, Curry filed a complaint in the District Court for the Southern District of Texas, alleging his back injury was caused by ENSCO's negligence and the unseaworthiness of the ENSCO 94. He demanded compensatory damages, as well as pre-judgment and post-judgment interest and attorney fees and costs.

At trial, Curry testified he could not say when on July 6, 1997, his injury happened or what particular incident had caused it. He stated that he assumed the injury was caused by swinging a sledgehammer while suspended in the riding belt. Three of Curry's coworkers testified that swinging a sledgehammer while in a riding belt was difficult and physically demanding work.[2] Two of the coworkers stated that the top drive could have been dismantled by erecting a scaffold around it or by laying it on the deck. They testified that working on the top rig in either of those situations

---

[2] Timmy Dean testified that five minutes in the sling was comparable to an hour of work on the floor. Chad Jones described the task as the most difficult part of tearing down the top drive while it was in the vertical position. A third coworker, Y.C. White, testified, "There ain't no man going to take a 12-pound hammer on a riding belt." Despite the implication of this statement, White also testified that it was not unsafe to use "a hammer" while in a riding belt.

4

was safer than dismantling it by use of a riding belt.  There was also testimony that the manufacturer of the top drive required its employees to work on top drives only with scaffolding or after they had been laid down.

Curry presented the expert testimony of Ed Robert, who the district court found qualified as a marine safety expert.  Robert opined that swinging a sledgehammer while suspended in a riding belt (as to opposed to swinging a sledgehammer while standing on a flat surface) was an unsafe practice.  In particular, he explained that the practice was unsafe because a worker suspended in the air cannot use his legs for leverage or to stop his motion:

> And the reason I say that that's a criticism, it's unsafe and unacceptable, in my judgment, my opinion, that when you're suspended in a riding belt, which is nothing more than straps between your legs and around your waist, you have no place to put your feet.  You're not holding onto anything, you're just hanging there.  And you swing that hammer, heavy hammer, it's like being in a child's swing. And you swing something like a baseball bat.  You just kind of go around, you don't have any control over stopping it.  And there are better ways to do it.  That's an unsafe practice, in my opinion, and shouldn't have been done that way.

The practice, he said, "puts a strain on [the worker's] system that just isn't necessary."  He stated that he based his opinion on his common sense understanding of leverage and body control, his personal experience with riding belts and the use of mauls, and his professional experience as the safety director of a drilling company.  With regard to industry custom and practice, Robert testified that when he was employed by the Mayronne drilling

5

company, the use of mauls while in a riding belt was "against [company] policy." He stated that two safer alternatives were to erect scaffolding or to lay the top drive on the platform floor.

Before the trial, ENSCO moved to strike Robert as a witness. At the hearing on ENSCO's motion the district court determined that ENSCO's criticisms of Robert's qualifications went to the weight of Robert's testimony, not its admissibility. The court therefore denied ENSCO's motion. At the trial, over ENSCO's renewed objection, the district court found Robert "well qualified" as an expert in the field of marine safety.[3]

Curry also presented the testimony of his treating orthopedic surgeon and neurologist. Dr. Frazer Gaar testified that it was "more probable than not" that Curry's herniated discs were caused by his riding belt work assignment on July 6, 1997. Dr. Bruce Raymon testified similarly, agreeing with the statement that Curry's herniated discs were "within a reasonable degree of medical

---

[3] On voir dire, Robert testified that he had worked as a roughneck on land rigs during two periods of his life. After receiving a bachelors degree in petroleum geology from the Louisiana State University, and then serving in the Navy, he worked as an exploration geologist. Later, he worked for fourteen years as the corporate safety and training director for the Mayronne Company, an offshore drilling contractor. In this capacity, he put together a safety program and monitored its effectiveness; conducted accident investigations and reconstructions; held safety meetings; and monitored compliance with government regulations. Since leaving Mayronne, Robert had offered course, seminars, and industry consulting services related to oilfield operations, equipment, and safety. Robert also stated that he had testified in over 120 state and federal trials in Alabama, Louisiana, Mississippi, and Texas.

probability related to his work activities on or about July 6, 1997."

ENSCO presented the expert testimony of Dr. Rajeev Kelkar, a biomechanical engineer. Dr. Kelkar stated that the amount of force that acts on a person's back when the person swings a sledgehammer while suspended in a riding belt is no different than that when the person swings the sledgehammer while standing on a flat surface. He explained that the load placed on the lower back is determined solely by what is in a person's hands and where the hands are in relation to the body, not by the location of the person's feet. He acknowledged, however, that the lack of leg support increases stress on a person's upper extremities.

At the close of the evidence, ENSCO moved for judgment as a matter of law on both of Curry's claims, as well as on Curry's demand for future medical expenses.[4] The district court denied the motions. Shortly thereafter, the jury returned a verdict finding that ENSCO's negligence was a cause of Curry's damage but that the drilling rig was seaworthy. In connection with the verdict of negligence, the jury attributed 60% of the fault to ENSCO and 40% to Curry. It awarded Curry $41,617 for loss of past earnings, $315,945 for loss of future earning capacity, $50,000 for pain and suffering, and $100,000 for future medical expenses for a total

---

[4] ENSCO attempted to move for judgment as a matter of law on these grounds at the close of Curry's proof; however, the district court stated that it would not entertain the motion until the jury had been instructed.

7

award of $507,562.

After taking the verdict, the district court requested briefing by the parties as to whether it should enter judgment as a matter of law that Curry was not contributorily negligent and whether Curry should be awarded future medical expenses. The court then entered an interim judgment awarding Curry the entire $507,562.

ENSCO filed posttrial pleadings to include the jury's 40% comparative fault finding in the interim judgment; to deny judgment as a matter of law that Curry was not contributorily negligent; to enter judgment as a matter of law rejecting Curry's negligence claim, including his request for future medical expenses; to deny Curry any award of pre-judgment interest; and to limit any award to Curry of post-judgment interest to the rate allowed by law. The district court denied all ENSCO's motions and ordered the entry of final judgment on May 15, 2001, in the amount of $507,562, plus pre-judgment and post-judgment interest at the rate of 7.5%. The court thus ruled implicitly, but not explicitly, that as a matter of law Curry was not contributorily negligent.

After the district court denied ENSCO's motion to alter the final judgment to include the jury's comparative fault finding, ENSCO timely appealed.

## II. ANALYSIS

### A. Curry's Expert Witness

ENSCO first claims that the district court erred in admitting the testimony of Curry's marine safety expert witness, Edward Robert. ENSCO contends Robert was unqualified and his opinion was unreliable and irrelevant.

We review a district court's decision to admit or disallow evidence for abuse of discretion.[5]

Under the Federal Rules of Evidence,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[6]

It is the duty of the district court, acting as the gatekeeper of evidence under Rule 702, to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."[7] This gatekeeping rule applies to all expert testimony.[8]

The *Daubert* Court identified specific factors a district court may consider in determining the admissibility of expert

---

[5] *General Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997); *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 667 (5th Cir. 1999).

[6] Fed. R. Evid. 702.

[7] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[8] *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

9

testimony of a scientific nature, such as testing, peer review, error rates, and acceptance within a relevant scientific community.[9]  The *Kuhmo* Court held that these factors "may" be considered in determining the admissibility of expert testimony based on technical or other specialized knowledge.[10]  It recognized, however, that in some kinds of cases, "the relevant reliability concerns may focus upon personal knowledge or experience."[11]  The particular circumstances of a particular case determine "how to test an expert's reliability."[12] In this respect, "the law grants the trial judge broad latitude."[13]  What is important is that the judge "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[14]

ENSCO's general challenge of the district court's determination that Robert's testimony was relevant and reliable is

---

[9] *Daubert*, 509 U.S. at 592-94 (explaining that some or all these factors may prove helpful in determining the reliability of a particular scientific theory or technique).

[10] *Kuhmo Tire*, 526 U.S. at 150.

[11] *Id.* (noting "*Daubert*'s description of the Rule 702 inquiry as 'a flexible one'").

[12] *Id.* at 150, 152.

[13] *Id.* at 153.

[14] *Id.* at 152.

without merit. Applying the teachings of *Kuhmo Tire*, we cannot say that the district court abused its discretion. The circumstances of this case, and of Robert's testimony, do not easily lend themselves to the factors identified in *Daubert*. Rather, this is one of those cases in which the relevant reliability concerns focus upon personal knowledge or experience.

Robert's experience as the safety director for the Mayronne drilling company and as an drilling industry safety consultant is generally relevant to this case about an injury on a drilling rig. Because he worked with top rigs and riding belts while at the Mayronne company, his experience also has particular relevance. The reliability of his opinion that using a maul while in a riding belt is an unsafe practice is demonstrated by the fact that Robert based his testimony, at least in part, on industry custom and practice. He testified that, while at Mayronne, he told a worker that the practice was "against [company] policy." Robert's testimony tends to show that he employed in the courtroom the same level of intellectual rigor that he employed while the safety director for a company in a relevant business. Hence, we cannot say that the district court abused its discretion in finding Robert "well qualified" to testify as an expert in the field of marine safety.

ENSCO also argues on appeal that Robert exceeded the scope of his expertise "when he gave his opinion that swinging a

11

sledgehammer in a riding belt places substantially greater stresses on a person's low back than when swinging the same sledgehammer while standing on a flat surface."[15] This argument is without merit because it mischaracterizes the expert opinion expressed by Robert and disregards the fact that ENSCO's counsel elicited Robert's statements on cross-examination about anatomical stress, which necessarily ENSCO's counsel could not and did not object to. At no time on direct examination did Robert use the words "stress" or "force" or otherwise offer an opinion on the mechanics of using a maul while standing or while in a swing.[16] It was only on cross-examination that the concepts of "stress" and "force" were introduced, and then they were raised by defense counsel—not by Robert.[17] Indeed, Robert repeatedly agreed that he

---

[15] In its motion in limine to exclude Robert's testimony, ENSCO attacked Robert's qualifications to offer any expert testimony on marine safety "because he is not a biomechanical engineer or otherwise qualified in any other relevant discipline." ENSCO asserted that Robert's testimony would amount to no more than an ipse dixit because he had no scientific basis for explaining why using a maul while in a riding belt was unsafe. In denying the motion, the district court concluded that ENSCO's objection to Robert went to "weight and not admissibility" and that ENSCO should attempt to "qualify" Robert "in front of the jury."

[16] The closest Robert came to such a statement on direct examination was when he opined that asking a worker to swing a sledgehammer while in a riding belt "puts a strain on your system that just isn't necessary." He made this comment in the context of explaining that ENSCO could have dismantled the top drive either by laying it down or erecting scaffold.

[17] Defense counsel asked Robert, "And the basis for your objection is because you believe that swinging a sledgehammer while suspended in a riding belt creates greater stresses and forces on your lower back than when you're swinging a hammer standing on a

12

was not qualified to speak to the mechanics of force on the human body. Rather his opinion was limited to observing the difference between using a sledgehammer while standing and while in a riding belt: "[I]t is a substantial difference between having your feet braced and strongly on the ground and having absolutely no support while just swinging in a riding belt." Thus, ENSCO's argument is neither meritorious nor forthright.

**B.    Curry's Negligence Claim**

ENSCO contends the district court erred in denying its motion for judgment as a matter of law as to Curry's negligence claim. In particular, it asserts that Curry failed to provide sufficient evidence of either ENSCO's negligence or its causation of Curry's damages.

An appeal of a district court's decision to deny a motion for judgment as a matter of law challenges the court's submission of the case to the jury and asks whether, as a matter of law, there was sufficient evidence to support the jury's verdict.[18]  In the context of a negligence claim arising under the Jones Act, a grant of judgment as a matter of law in favor of an employer is proper "only when there is a complete absence of probative facts" to

---

flat surface." Robert responded, "That's correct." Defense counsel did not object to Robert's answer.

[18] *Fontenot v. Teledyne Movible Offshore, Inc.*, 714 F.2d 17, 19 (5th Cir. 1983).

13

support the seaman's position.[19] "This standard is highly favorable to the plaintiff and requires that we validate the jury verdict if at all possible."[20]

With regard to the element of causation, we have held that a plaintiff's burden of proof is featherweight, and that the jury is entitled to make permissible inferences from unexplained events.[21] We nonetheless require the plaintiff to show sufficient facts to "justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury for which" he seeks damages.[22]

The trial testimony included probative evidence that the use of a sledgehammer while in a riding belt was an unsafe practice and that Curry's injuries were likely caused by that unsafe practice. Roberts specifically testified that the practice was

---

[19] *Springborn v. American Commercial Barge Lines*, 767 F.2d 89, 98 (5th Cir. 1985) (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)); *see also Fontenot*, 714 F.2d at 19; 9A Wright & Miller, *Federal Practice & Procedure*, § 2526 (2d ed. 1995).

[20] *Hughes v. Int'l Diving and Consulting Serv., Inc.*, 68 F.3d 90, 93 (5th Cir. 1995). ENSCO argued in its briefs that in the wake of *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the standard of review for sufficiency of evidence in Jones Act claims should not be so deferential. We disagree and decline to diverge from the well established law of this Circuit.

[21] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 548-49 (5th Cir. 1987); *see also Comeaux v. T.L. James & Co.*, 702 F.2d 1023 (5th Cir. 1983); Maraist & Galligan, *Personal Injury in Admiralty* § 6-4(e) (2000).

[22] *Springborn*, 767 F.2d at 98 (citations omitted).

14

unsafe. Curry's coworkers, Timmy Dean and Chad Jones, testified that working on a top rig from a scaffold or after it had been laid flat was, in general, safer than working on it from a riding belt. Y.C. White, another coworker, testified that "no man [would] take a 12-pound hammer on a riding belt." His testimony could reasonably be interpreted to suggest that the use of a maul while in a riding belt was unsafe. Finally, the testimony shows that Curry worked in the riding belt for six to seven hours that day. During that time he performed what one coworker said was the most difficult task of the tear-down project. Another coworker said about that task that five minutes of work was the equivalent of an hour of work out of the belt. Using common sense, a reasonable jury could interpret this testimony to show Curry's work assignment was unsafe.

Specifically as to causation, Drs. Gaar and Raymon testified that Curry's injuries were "more probabl[y] than not" related to his work in the riding belt and "within a reasonable degree of medical probability related to his work activities on or about July 6, 1997." Further, Jones testified that Curry complained of pain after he had been in the riding belt and that he could see pain on Curry's face after he finished his work with the sledgehammer while in the riding belt.

Given his slight burden to produce probative evidence of breach and causation, we conclude that Curry proffered sufficient evidence from which a reasonable jury could conclude that ENSCO

15

had breached its duty and that its breach played some role in his injury. The district court did not abuse its discretion by denying judgment as a matter of law on Curry's negligence claim.

## C.   Contributory Negligence

ENSCO contends the district court erred in entering judgment as a matter of law for Curry that he was not contributorily negligent. We agree. Although the entry of final judgment for Curry without a forty percent discount had that effect, the procedural history of this case reveals that the court was not authorized to grant judgment as a matter of law as to Curry's lack of fault.[23]

Rule 50 of the Federal Rules of Civil Procedure allows a party to "renew its request for judgment as a matter of law" after trial.[24] We have interpreted this language to mean that a party *must* have raised a Rule 50(a) motion prior to the close of proof in order to "renew" such a motion after the verdict has been received: "The motion for directed verdict is . . . 'a prerequisite' [to a renewed motion for judgment as a matter of law] and is 'virtually jurisdictional.'"[25] We have also stated

---

[23] *See Cargill, Inc. v. Weston*, 520 F.2d 669 (8th Cir. 1975) ("While the trial court's action had the same effect as a judgment n.o.v., it is clear that judgment n.o.v. was not granted nor could it have been granted on the present record.").

[24] Fed. R. Civ. P. 50(b).

[25] *Allied Bank-West, N.A. v. Stein*, 996 F.2d 111, 115 (5th Cir. 1993) (quoting *Perricone v. Kansas City S. Ry. Co.*, 704 F.2d 1376,

that "a motion for JNOV 'cannot assert a ground that was not included in the motion for directed verdict.'"[26]  Finally, these limitations to Rule 50 apply to a district court acting *sua sponte*.[27]

This rule can be harsh, and we have excused the movant from its strictures in certain situations.  Hence, our cases recognize that we will permit "the granting of a motion for judgment notwithstanding the verdict where a motion for directed verdict was made at the close of the plaintiff's case but was not renewed at the close of all the evidence" and where the movant objected to the jury instructions "on grounds that there was no evidence to support a claim but failed to move for a directed verdict on that

---

1380 (5th Cir. 1983)); *see also* 9A Wright & Miller, *Federal Practice & Procedure* § 2537 (2d ed. 1995).

[26] *Id.* (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985)).

[27] *See Mozingo*, 752 F.2d at 172 (reversing a district court's grant of JNOV on a basis not previously raised in a motion for directed verdict); *see also American & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159 (6th Cir. 1997) ("While it is accepted that a judge may sua sponte granted a directed verdict pursuant to [Rule] 50(a), allowing a judge to sua sponte raise a new issue post-verdict and proceed to overturn a jury verdict on that basis contravenes the dictates of Rule 50(b)." (internal citations omitted)); *Murphy v. City of Long Beach*, 914 F.2d 183, 185-86 (9th Cir. 1990) (holding that "for the same reasons a party may not seek a JNOV on grounds not alleged in their motion for directed verdict, a district court may not enter JNOV on grounds not asserted in a party's motion for directed verdict"); *Kutner Buick, Inc. v. American Motor Corp.*, 868 F.2d 614, 617 (3d Cir. 1989) (reversing a district court's grant of JNOV on grounds other than those advanced by the movant).

17

claim."[28]

The present case presents no grounds for excusing Curry's failure to establish a predicate for a motion for judgment as a matter of law. Curry conceded at oral argument that he never moved for judgment as a matter of law on the issue of contributory negligence. Nor did he object to the jury instruction regarding apportionment of fault. After the case had been submitted to the jury, the district court questioned whether there was sufficient evidence to support a finding of contributory negligence on the part of Curry but let the issue go to the jury. Only after the verdict was taken did the court order the parties to brief the issue. In short, the necessary predicates to a judgment as a matter of law as to Curry's contributory negligence are missing from this case. Hence, the district court erred when it subsequently ordered final judgment be entered on Curry's behalf without any discount for the jury's finding and apportionment of contributory negligence.

Having determined that the district court erred, we must decide the proper disposition of this appeal. In a case involving an erroneous grant of judgment as a matter of law we can reverse and order the district court to reinstate the jury verdict,[29] we

---

[28] *Hinojosa v. City of Terrell, Texas*, 834 F.2d 1223, 1228 (5th Cir. 1988) (citations omitted).

[29] *See* 9 *Moore's Federal Practice* § 50.93[2]; 9A Wright & Miller, *Federal Practice & Procedure* § 2540 n.11 (citing cases);

18

can reverse and remand for the district court to determine whether to order a new trial under the provisions of Rule 59,[30] or we can order a new trial directly "if the evidence was insufficient because of some trial court error and . . . a second trial is warranted."[31]  Because the district court neither articulated its

_____

see also *Morante v. American Gen. Fin. Ctr.*, 157 F.3d 1006, 1011 (5th Cir. 1998); *H.C. Blackwell Co. v. Kenworth Truck, Inc.*, 620 F.2d 104, 107 (5th Cir. 1980) ("Where the trial court has granted a judgment notwithstanding the verdict we may, in appropriate cases where there is sufficient evidence . . . to support a jury verdict to the contrary, order the reinstatement of the jury verdict.").

[30] *See* 9 *Moore's Federal Practice* § 50.95 n.3 (citing Rule 50(d) for the proposition that "if appellate court reverses judgment as matter of law, nothing in Rule precludes appellate court from determining that appellee is entitled to new trial or from directing trial court to determine whether new trial should be granted"); 9A Wright & Miller, *Federal Practice & Procedure* § 2539 n.6 (noting that in circumstances where a party fails to move properly for judgment as a matter of law, the trial court can order a new trial); *see also Iacuri v. Lummus Co.*, 387 U.S. 86, 88 (1967) (remanding to the district court, which "was in the best position to pass upon the question of a new trial in light of the evidence"); *Gorsalitz v. Olin Mathieson Chem. Corp.*, 429 F.2d 1033, 1038 (5th Cir. 1970) (discussing a district court's authority to order a new trial under Rule 59(d) and an appellate court's authority to require further proceedings as may be just under the circumstances).

[31] 9A Wright & Miller, *Federal Practice & Procedure* § 2540 at n.12; *see also Cargill, Inc. v. Weston*, 520 F.2d 669, 672 (8th Cir. 1975) (ordering a new trial where the "trial court clearly indicated its belief that the jury's verdict was erroneous" and because the case turned on unaddressed questions arising under the Uniform Commercial Code).  We note that this is not a case in which the trial court considered and rejected the appellant's motion for judgment as a matter of law or in the alternative a new trial, such that it would be appropriate to review the trial court's decision at least for plain error.  *See Hinojosa v. City of Terrell, Texas*, 834 F.2d 1223, 1228 (5th Cir. 1988) (applying plain error review because the appellant had failed to move for a directed verdict).

reasons for setting aside the jury's apportionment of fault nor considered whether to grant a new trial under Rule 59(d), we believe that the best course of action here is to reverse the district court's attempt to grant judgment as a matter of law on the issue of Curry's fault and remand for the court's consideration of a motion for a new trial pursuant to Rule 59 on its own initiative or by Curry.

## D. Future Medical Expenses

ENSCO contends the district court erred in denying its motion for judgment as a matter of law on the issue of future medical expenses. We agree.

We review the district court's action using the same highly deferential standard we applied to the court's action regarding Curry's negligence claim.[32] Under Texas law, a plaintiff must show a reasonable probability that medical expenses will be incurred in the future and that such expenses are reasonable and necessary.[33]

---

[32] *See supra* Section II.B.

[33] *Whatley v. Armstrong World Indus., Inc.*, 861 F.2d 837, 843 (5th Cir. 1988) (citing *Keeler v. Richards Mfg. Co.*, 817 F.2d 1197, 1202 (5th Cir. 1987), and *Pan Am. Ins. Co. v. Hi-Plains Haulers, Inc.*, 350 S.W. 644, 646 (Tex. 1961)); *see also Herbert v. Wal-Mart Stores, Inc.,* 911 F.2d 1044, 1050 (5th Cir. 1990) (affirming a judgment as a matter of law that plaintiff did not prove future medical expenses because he "failed to prove that he needed further medical care"); *Davis v. Mobil Oil Exploration & Producing S.E., Inc.*, 864 F.2d 1171, 1176 (5th Cir. 1989) (reversing an award of future medical expenses in the face of the plaintiff's failure "to produce any specific evidence at trial to support [the award] other than the possibility that he might require some type of medical care in the future").

No damages award can be made based solely on speculation.[34]

Dr. Raymon testified that Curry still had intermittent back pains when he left his care in September 1998, for which he used nonprescription pain medication. Curry testified that he was under the care of his family physician for pain management and that he currently takes both prescription and nonprescription pain medication. He did not, however, offer any evidence that he will require any specified medical treatment for his injury in the future. Nor, therefore, did he offer any evidence regarding the estimated cost of any such future medical expenses or whether such expenses were reasonable and necessary. Instead, Curry offered only the evidence of his continuing back pains and his past medical expenses, from which he asked the jury to infer the likelihood of future medical expenses. Given the substance of Curry's evidence, we conclude that the jury's award of $100,000 in future medical expenses rests solely on speculation and conjecture. Accordingly, we find the district court erred in denying ENSCO's motion for judgment as a matter of law on this issue.

**E.    Pre-Judgment Interest**

ENSCO contends the district court erred in awarding Curry pre-judgment interest. Because "[i]t is well settled that under the Jones Act, recovery of prejudgment interest is not permitted,"

---

[34] *See Keeler*, 817 F.2d at 1202 (citations omitted).

and because Curry does not contest this point, we find the district court's award of pre-judgment interest was in error.[35]

## F.    Post-Judgment Interest

ENSCO contends the district court erred in awarding Curry post-judgment interest at a rate greater than allowed by law. Because the post-judgment rate of interest for the week during which final judgment in this matter was entered was 3.76%, and because Curry concedes this fact, we find the district court's award of post-judgment interest at the rate of 7.5% was in error.[36]

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of ENSCO's motion for judgment as a matter of law as to the questions of breach and causation but **REVERSE** as to the question of future medical expenses.  We also **REVERSE** the district court's *sua sponte* grant of judgment as a matter of law that Curry was not contributorily negligent.  Upon remand, the district court should either order a new trial or enter judgment consist with the jury's

---

[35] *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir. 1989) (citation omitted); Maraist & Galligan, *Personal Injury in Admiralty* § 6-7 (2000).

[36] *See* 28 U.S.C. § 1961(a) (providing that the rate of post-judgment interest is calculated from the date on which final judgment is entered and is equivalent "to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of judgment"); Table, Post-Judgment Interest 2001, at http://www.txs.uscourts.gov/ interest/int2001.htm (noting the rate of post-judgment interest for the week of May 14, 2001, was 3.76%).

apportionment of fault.  Finally, we **REVERSE** the district court's award of pre-judgment interest and **REVERSE** the district court's award of post-judgment interest to the extent that it set the interest rate at 7.5% instead of 3.76%.  We **REMAND** the case for further proceedings consistent with this opinion.